U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED

# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

'07 OCT 29 P4:04

Mr. Nicholas Black, et al.,
Plaintiff,

JON ... SANFILIPPO
CLERK

v. Civil Action No. 07-C-0964

Defendant, Matthew J. Frank, is the Secretary of the Department of Corrections,
Dan Westfield, is the Security Chief,
Jeffery Endicott, is the Warden of Redgranite Correctional Institution,

Security Director Scott Eckstein,
Sally J. Wess, is the Inmate Complaint Examiner (ICE),
Randy Trinrud, is Lieutenant Employed at Redgranite Correctional Institution et al.,
Defendants

## COMPLAINT UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983

### I. PLACE OF PRESENT CONFINEMENT

Plaintiff, Nichols Black, is presently incarcerated at, Redgranite Correctional Institution, P.O. Box 925, Redgranite, WI 54970, is and was at all times mentioned herein a prisoner of the State of Wisconsin in the custody of the Wisconsin Department of Corrections. He is currently confined in, Redgranite Correctional Institution, P.O. Box 925, Redgranite, WI 54970.

A. There is a grievance procedure in this prison

B. I have filed grievances concerning the facts relating to this complaint.

## II. PARTIES

A. Mr. Nicholas Black (Plaintiff)

B. My prison ID number is: 398031

C. The Last 4 digits of my Social Security Number are: 0668

D. My current address is: Redgranite Correctional Institution, P.O. Box 925, Redgranite, WI 54970.

E. The Defendant's are: Each defendant is sued in His/Her individual capacity.

1. Matthew J. Frank, is the Secretary of the Department of Corrections

2. Dan Westfield, is the Security Chief of the Department of Corrections

3. Jeffery Endicott, is the Warden of Redgranite Correctional Institution

5. Scott Eckstein is the Security Director of Redgranite Correctional Institution

6. Sally J. Wess, is the Inmate Complaint Examiner (ICE), at Redgranite Correctional Institution

7. Randy Trinrud, is a Lieutenant and the Designated Security Threat Group Coordinator, at Redgranite Correctional Institution

## III. PREVIOUS LAW SUITS

A. I have never begun another state or federal lawsuit in either court relating to these facts.

B. I have never begun a state or Federal Lawsuit relation to my incarceration.

C. I answered "No" to both of the above.

## IV. STATEMENT OF CLAIM

A. The Facts of this case are as follows:

## PART A

My complaint is that:

The Wisconsin Department of Corrections violated my 1st, 5th, and 14th Constitutional Amendment rights with deliberate indifference by confiscating and denying my religious texts, along with several other rightfully possessed publications. The Wisconsin Department of Corrections violated my Constitutional rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA) with deliberate indifference in confiscating a denying my religious texts. At no time during these events was I, nor did I pose a threat to R.G.C.I.

While I was incarcerated at Redgranite Correctional Institution, the actions by Department of Corrections employees were enacted in a deliberately indifferent manner to my rights and in turn caused me great torment, mental anguish, anxiety, and to be singled out for special treatment.

1.) On February 2, 2007, I had my cell searched and contraband was confiscated. I was issues a "Contraband Property Tag" for: 20 publications, 5 Misc. Articles, and 2 RGIC Laundry Passes. **Exhibit A** The 20 publications were all books, including *Message to the Blackman on America*, which is a Religious text, and the 5 miscellaneous articles were Final Call Newspapers. The exact titles of these books are listed as **Exhibit B** (this photo-copy was give to me by Lt. Trinrud on the morning of April 3, 2007. Not pictured here, though confiscated on this (2/2/07) morning as well, are the two books he returned to me that morning, *100 years of lynching* and *Investing in Fixer-Uppers…*) the reason these books are listed this way is because there were not itemized on the contraband form, exhibit A. This confiscation along with the subsequent denials of these materials was a violation of my constitutional rights. This confiscation stressed me out so much that they caused me to begin to have debilitating headaches. The reason I was stressed was because the materials that were confiscated from me were not ordinary publications, they were religious texts to me and other adherents to the teachings of the Nation of Islam. Without these religious materials (the Final Call Newspaper and the book Message to the Blackman in America) I could not practice my religion.

2.) On February 4, 2007, I submitted a health services request complaining about some debilitating headaches I had been having since the morning of the confiscation of my religious materials. **Exhibit C**
   a. The nurse, who examined me, performed a number of test. She tested my blood sugar etc. and found me to be in otherwise perfect health. She was

first to tell me that my headaches were probably caused by stress. NOTE: I had not been stressed before.

b. This nurse also prescribed for me Acetaminophen 325mg. **Exhibit D**

3.) On March 20,2007, I submitted a new Health Services request, requesting to be seen again for my headaches, as the medicine she'd prescribed me was becoming ineffective and I was feeling like my headaches had grown in intensity. **Exhibit E**

a. I was seen on March 30, 2007, by the Institutions Dr. During this visit, he prescribed for me, Acet/ ASA/ Caff 250/250/65. He told me during this visit, that my headaches are likely being caused by stress, and that I should take it easy. **Exhibit F** With this advice,

4.) On March 22, 2007, I met with F-Unit Psychologist, Dr. Marcelleno. Our talk was about the stress I was under after having my religious materials confiscated and denied to me. I asked him for stress relief techniques. He gave me what he could at this time, then told me that he would recommend me to Dr. Bannister to participate in his "Mindfulness group", where stress relief was their goal. **Exhibit G**

5.) On March 29 2007, I was given a "Notice of Non-Delivery of Mail/Publication" (DOC-243) form, denying the March 27th, 2007, edition of the Final Call Newspaper. The back of this denial form contained the signatures of the Publication Review Committee (DOC-2227). These members are, Disruptive Groups Coordinator Lt. Trinrud, Security Director, Eckstein, and the Warden, J. Endicott. **Exhibit H** In response to this notice, I filed an inmate complaint. The result of this complaint was that it was dismissed. **Exhibit I** This denial was a violation of my constitutional rights. This denial of my religious material caused me more torment, mental anguish, anxiety, and to be singled out for special treatment.

a. On March 29, I filed an ICE. In March 30, 2007, ICE received my complaint and issued it complaint number **RGCI-2007-9457**. Throughout my complaint, I made the officials aware that they were doing wrong, but I was ignored.

b. On April 19, 2007, ICE, Sally Wess, reported that, "*the publication in question contains a reoccurring article (Pg. 39) that is inappropriate. This article is printed in each issue and as long as these continue to appear, the publication will continue to be denied. In accordance with DOC 309.05(2)(b), this publication is considered injurious... and poses a thread to the security and orderly operation, discipline or safety of the institution. The above mentioned articles are interpreted to teach or advocate behavior that violates the rules of the Department. This publication has been denied throughout the DOC, as noted on the DOC publication List, for the reasons explained above and as such, will be denied at RGCI...Considering the above, it is recommended that this complaint be dismissed*"

c. On April 27, 2007, Warden, Jeff Endicott, affirmed this decision and dismissed this complaint as well.
d. On May 4, 2007, the CCE received my appeal to this decision.
e. On May 4, 2007, CCE, Tom Gozinske, reported that the he agreed with the ICE's decision and dismissed this complaint as well.
f. On May 4, 2007, the Secretary affirmed this decision via. Mr. Rick Reamisch

6.) On March 29, 2007, I was given a "Notice of Non-Delivery of Mail/Publication" (DOC-243) form denying the book *Consequences of Oppression: Hell on Earth.* The back of this denial form contained the signatures of the Publication Review Committee (DOC-2227). These members are, Disruptive Groups Coordinator Lt. Trinrud, Security Director, Eckstein, and the Warden, J. Endicott. **Exhibit J** This denial was a violation of my constitution rights. In response to this notice, I filed an inmate complaint. The result of this complaint was that it was dismissed. **Exhibit K**

a. I filed a complaint on March 29, 2007. My complaint was received on April 2, 2007, and assign Complaint No. **RGCI-2007-9687.** Throughout my complaint, I made the officials aware that they were doing wrong, but I was ignored.
b. On April 19, 2007, I received ICE's decision to dismiss my complaint. ICE'S decision stated that this book "also contains references to bestiality, which is in violation of WAC DOC 309.04(4)(c)(8)(a)."
c. On April 19, 2007, this decision was reviewed by Deputy Warden Beck, and affirmed.
d. On April 29, 07 I filed an Appeal with the CCE. My appeal was received on May 1, 2007.
e. On May 1, 2007, The CCE, Mr. Tom Gozinski further dismissed this complaint, agreeing with the ICE's findings.
f. On May 2, 2007, The Secretary affirmed this decision via. Mr. Rick Reamisch

7.) On April 2, 2007, I submitted a Health Services request requesting the prescription I had been prescribed for my headaches. At this time I was experiencing a great amount of pain. **Exhibit L**

8.) On April 3, 2007, I met with Lt. Trinrud to discuss the return of my confiscated books and newspapers. During this meeting he returned to me 2 books. The books were *100 year of Lynching* and *Investing in Fixer-Uppers…* Also during this meeting he informed me that he'd be denying: the Final Call Newspaper and the books; *Message to the Blackman in America, Message to the Whiteman and Woman in America, The Isis Papers, Lessons of the Gods and Earths,* And *From Niggas to Gods Vol.s 1 and 2.* (**See Exhibit B**) This meeting stressed me as he told me that he was going to deny my religious texts from me.

9.) On April 6, 2007, I wrote a letter to DOC Security Chief, Mr. Dan Westfield, informing him of my issues with the Department regarding the validity that there in-fact was a state wide ban on The Final Call Newspaper, as ICE Wess had informed me. I asked that he respond to me in writing. **Exhibit N**

a. On April 12, 2007, I received a letter from Warden, Endicott here at RGCI. His letter informed me to not correspond with Mr. Westfield and to direct all of my questions and correspondence to him. He further informed me that he was now handling the situation; however, he did not answer any of the questions I asked Mr. Westfield. **Exhibit O**

10.) On April 10, 2007, I was given a "Notice of Non-Delivery of Mail/Publication" (DOC-243) form, denying the April 3rd, 2007, edition of the Final Call Newspaper. The back of this denial form contained the signatures of the Publication Review Committee (DOC-2227). These members are, Disruptive Groups Coordinator Lt. Trinrud, Security Director, Eckstein, and the Warden, J. Endicott. **Exhibit P** In response to this notice, I filed an inmate complaint. The result of this complaint was that it was dismissed. **Exhibit Q** This denial was a violation of my constitutional rights. This denial of my religious material caused me more torment, mental anguish, anxiety, and to be singled out for special treatment.

a. On April 12, 2007, ICE received my complaint and issued it complaint number **RGCI-2007-10941**. Throughout my complaint, I made the officials aware that they were doing wrong, but I was ignored.
b. On May 8, 2007, ICE, Sally Wess, reported that, "*the publication in question contains a reoccurring article (Pg. 39) that is inappropriate. This article is printed in each issue and as long as these continue to appear, the publication will continue to be denied. In accordance with DOC 309.05(2)(b), this publication is considered injurious… and poses a thread to the security and orderly operation, discipline or safety of the institution. The above mentioned articles are interpreted to teach or advocate behavior that violates the rules of the Department. This publication has been denied throughout the DOC, as noted on the DOC publication List, for the reasons explained above and as such, will be denied at RGCI…Considering the above, it is recommended that this complaint be dismissed*"
c. On May 10, 2007, Deputy Warden, Steven Beck, affirmed this decision and dismissed this complaint as well.
d. On May 18, 2007, the CCE received my appeal to this decision.
e. On May 18, 2007, CCE, Tom Gozinske, reported that the he agreed with the ICE's decision and dismissed this complaint as well.
f. On May 21, 2007, the Secretary affirmed this decision via. Mr. Rick Reamisch

11.) On April 11, 2007, I met with Crisis Intervention worker "Chris" regarding the stress I was undergoing as a result of having my religious materials taken from me. **Exhibit R**

a. He did not have any notable advice for me.

12.) On April 13, 2007, I was given a "Notice of Non-Delivery of Mail/Publication" (DOC-243) form denying the April 10th, 2007, edition of the Final Call Newspaper. The back of this denial form contained the signatures of the Publication Review Committee (DOC-2227).These members are, Disruptive Groups Coordinator Lt. Trinrud, Security Director, Eckstein, and the Warden, J. Endicott They all agreed with Lt. Trinrud's initial decision to deny this publication. I filed a complaint. The result of this complaint was that it was dismissed. **Exhibit S** In response to this notice, I filed an inmate complaint. The result of this complaint was that it was dismissed. **Exhibit T** This denial was a violation of my constitutional rights. This denial of my religious material caused me more torment, mental anguish, anxiety, and to be singled out for special treatment.

a. On April 19, 2007, ICE received my complaint and issued it complaint number **RGCI-2007-11708**. Throughout my complaint, I made the officials aware that they were doing wrong, but I was ignored.
b. On May 8, 2007, ICE, Sally Wess, reported that, "*the publication in question contains a reoccurring article (Pg. 39) that is inappropriate. This article is printed in each issue and as long as these continue to appear, the publication will continue to be denied. In accordance with DOC 309.05(2)(b), this publication is considered injurious... and poses a thread to the security and orderly operation, discipline or safety of the institution. The above mentioned articles are interpreted to teach or advocate behavior that violates the rules of the Department. This publication has been denied throughout the DOC, as noted on the DOC publication List, for the reasons explained above and as such, will be denied at RGCI...Considering the above, it is recommended that this complaint be dismissed*"
c. On May 10, 2007, Deputy Warden, Steven Beck, affirmed this decision and dismissed this complaint as well.
d. On May 18, 2007, the CCE received my appeal to this decision.
e. On May 18, 2007, CCE, Tom Gozinske, reported that the he agreed with the ICE's decision and dismissed this complaint as well.
f. On May 21, 2007, the Secretary, affirmed this decision via. Mr. Rick Reamisch

13.) On April 16, 2007, I sent a letter to Warden, Endicott reiterating the questions I'd posed to Mr. Westfield. My primary question was whether these newspapers were denied thought the state as ICE Wess had said, and if so why? **Exhibit U**

a. The Warden responded to me on May 7, 2007. His response was evasive in regards to answering any of my questions, as he upheld the denial of my Newspapers and books. **Exhibit V**

14.) On April 18, 2007, upon information and belief, my mother sent a letter to Mr. Westfield requesting information about the confiscation and detention of my

already approved religious materials, as well as a copy of the Department of Corrections' list of denied books and publications. She asked for the latter so that she nor I would order books and other publications that were already known to be denied. She asked to be responded to in writing. **Exhibit W**

a. To this letter my mother wrote, she was never responded to.

15.) On April 25, 2007, my cell was searched by c/o Ralls and contraband was confiscated. I was issued a "Contraband Property Tag" for: 2 editions of the Final Call Newspaper. Editions from July 11, 2006 and August 8, 2006. This confiscation was a violation of my constitutional rights. This confiscation caused me more torment, mental anguish, anxiety, and to be singled out for special treatment. **Exhibit X**

16.) On May 4, 2007, I met with F-Unit Psychologist, Dr. Marcelleno. Our talk was about the stress I was under after having my religious materials confiscated and denied to me. I again, asked him for stress relief techniques, as I had not been admitted to the "Mindfulness group". **Exhibit Y**

17.) On May 7, 2007, upon information and belief, my mother sent a letter to Secretary of Corrections, Mr. Matthew J. Frank, requesting the same information she had from Mr. Westfield. We requested a copy of the Department of Corrections' denied book list, and why the book Message to the Blackman was denied, and why the Final Call Newspaper is being denied. She asked to be responded to in writing. **Exhibit Z**

a. She was never responded to.

18.) On Friday May 11, 2007, I met with RGCI Security Director, Eckstein regarding my mother's letters. During this meeting, Director Eckstein informed me that my Final Call Newspapers would continue to be denied at that point; however, they were reviewing those decisions then attempted to return to me my book, *Message to the Blackman in America*. I stopped him from returning me the book, telling him that the same article that has caused the Final Call Newspaper to be denied was also printed in the back of the book and that it appears the same way. Director Eckstein looked at that page, looked at a Final Call Newspaper, thanked me for pointing that out, and said he would keep the book for now and get back to me on Monday. It was odd to me, his surprise at the Black Separatism that was in this book that was also the cause of the Final Call Being denied, as his signature was on the denial forms as well. This meeting stressed me, because he had handed me my religious text back but they took it back because it to was not being said to contain "Black Separatism".

a. On Monday May 14, 2007, Director Eckstein kept his word and got back to me on Monday. He told me that he still did not reach a decision on the book, but as soon as one was reached, he'd let me know. I was disappointed that I did not get my book back.

19.) On May 21, 2007, I met with Lt. Trinrud and he returned to me most of my confiscated books. Most significantly, he returned to me, *Message to the Blackman in America*. I pointed out to him that the same article that caused the Final Call to be denied was also printed in this book, he told me he knew and returned the book to me. There were12 books in all returned to me, they are all listed on the "contraband form" I received. **Exhibit AA** I was stressed more after this meeting because I was told that my religious newspaper was still to be denied, even though the book that contained the same information that caused the denial of the newspaper was in the book itself.

20.) On May 25, 2007, Due to the return of Message to the Blackman, with its same "Black Separatism", I filed a complaint regarding the denial of every Final Call Newspaper I'd ever had denied, or ever will have denied for the cause of "Black Separatism." I asked to be monetarily compensated for the harm done to me by these arbitrary denials. **Exhibit AB** (in the word every, I was also referring to the Final Call Denials not previously mentioned in this writing. Those issues denial were on: 2/26/2007 (one new issue was denied), 2/26/2007 (one new issue was denied), 2/26/07 (one new issue was denied), 3/10/07 (one new issue was denied), 3/19/2007 (3, old issues were denied)- all totaling 7 additional issues. **Exhibit AC** This denial was a violation of my constitutional rights. This rejection of my religious material caused me more torment, mental anguish, anxiety, and to be singled out for special treatment.

This complaint is Exhibit ACC →

a. On May 30, 2007, my complaint was received by ICE. ICE then assigned it the complaint **No. RGCI-2007-15887**. Throughout my complaint, I made the officials aware that they were doing wrong, but I was ignored.
b. On May 31, 2007, ICE rejected this complaint reasoning that, "there is no provision in the administrative code for the granting of monetary damages in circumstances such as this."
c. On June 8, 2007, I filed a REQUEST FOR REVIEW OF REJECTED COMPLAINT. My argument was that if what ICE was saying was true, she still could have proceeded with the complaint and just returned to me the editions of the Final Call she had.
d. On June 11, 2007, the Reviewing authority acknowledged receipt of this appeal
e. On June 11, 2007, the Reviewing Authority, upheld ICE's decision and rejected this complaint and appeal as being untimely. This was a only a conspiracy to thwart my appeal of this arbitrary decision. Do note on the bottom of ICE's rejection say's that this complaint was printed on June 1, 2007, and I put my complaint it the box on the Night of June 8, 2007. So their June 11, receipt date was, Bogus, for lack of a better term.

21.) On May 28, 2007, I sent a letter to Lt. Trinrud, with concerns regarding the "cause" for the initial search of my cell (by this time I'd asked the searching officers and they'd referred me to Lt. Trinrud), the confiscation of my books, newspapers, and other miscellaneous materials. After I'd received my books back, nothing more was ever said about the Final Call's that were also confiscated in

that same search, and the search that took place on April 25, 2007. I asked that he respond to me in writing. **Exhibit AD**

a. On May 31, 2007, Lt Trinrud, did not respond to this letter, he gave me a "NON DELIVERY OF MAIL/PUBLIACTION" (DOC-243) form, denying all the materials I asked him for. **Exhibit AE**

22.) On May 31, 2007, I was given a "Notice of Non Delivery of Mail/Publication" (DOC-243) form, signed (ONLY) by Lt. Trinrud. **See Exhibit AE** This form was denying 8 publications. The publications were 5 editions of the Final Call Newspaper, the books: *From Niggas to Gods* Vol.s *1* and *2*, and *Lessons of the Gods and Earths*. ICE Wess, would not allow me to complain about all of these materials at once, so I filed 2 separate complaints, one regarding the Final Call Newspapers and the other regarding the two books that I was contesting. This denial is a clear demonstration of the arbitrary and deliberate indifferent behavior in regards to my religious rights. This denial was of the same material (the Final Call Newspapers) that was expressly approved a given to me on May 21, 2007, was again denied.

a. On July 8, 2007, I filed a complaint regarding the 5 editions of Final Call Newspaper that were denied to me. The editions were dated 7-11-2006, 8-8-2006, 9-13-2005, 9-20-2005, and 8-16-2005. **Exhibit AF** This denial was a violation of my constitutional rights. This denial of my religious material caused me more torment, mental anguish, anxiety, and to be singled out for special treatment.
    i. ICE on July 12, 2007, This complaint was received by and assigned the complaint number **RGCI-2007-20344.** Throughout my complaint, I made the officials aware that they were doing wrong, but I was ignored.
    ii. On July 26, 2007, ICE's decision regarding this complaint was to Dismiss this complaint with modification. ICE states that Security Director Westfield was reviewing these publications and she wanted to defer her decision to him.
    iii. On July 27, 2007, The Reviewer, Deputy Warden, Steven Beck, reviewed ICE's findings and affirmed her decision to dismiss this complaint with modifications
    iv. On July 29, 2007, I filed a Appeal of this decision to the CCE.
    v. On July 31, 2007, The CCE, acknowledged receipt of my complaint
    vi. On July 31, 2007, The CCE, Mr. Tom Gozinski dismissed my complaint appeal, in agreement with the ICE's decision.
    vii. On August 2, 2007, The Secretary the Deputy Secretary, Affirmed the CCE's decision.

b. On July 11, 2007, I filed a complaint regarding the denial of the two books, "*From Niggas to Gods*" Volumes 1 and 2. **Exhibit AG**
    i. On July 18, this complaint was received and given the complaint number **RGCI-2007-20970.**

ii. On July 26, 2007, ICE S. Wess stated that:
"These books exhibit a belief that race accounts for differences in human character or ability and that a particular race is superior to others. Specifically, that the White Race continues to enslave the Black race." From the book, *Volume 1*, it was cited:
   - "The whiteman controls us through psychological warfare, by using our emotions to make us self destructive! This way he can get rid of us poor, silly dumb niggas, with out getting his hands bloody anymore." P.121
   - "The whiteman is constantly trying to hold the Blackman back because he is totally afraid of competing with the Blackman fairly and squarely." P. 127
   - "North AmeriKKKa." P. 243

ICE went on to note that "these publications are denied on the DAI Reviewed Publications List. This type of material teaches or advocated violence or hatred, thus presents a danger to Institutional security and order." PLEASE NOTE: that there were no citation from Vol. 2, yet it was denied as well. ICE's decision was to dismiss this complaint.

iii. On July 27, 2007, Reviewer, Deputy Warden, Steven Beck, reviewed ICE's findings and affirmed her decision to dismiss this complaint.

iv. On July 29, 2007, I filed a Appeal of this decision to the CCE.

v. On July 31, 2007, The CCE, acknowledged receipt of my complaint

vi. On July 31, 2007, The CCE, Mr. Tom Gozinski dismissed my complaint appeal, in agreement with the ICE's decision.

vii. On August 2, 2007, The Deputy Secretary, Mr. Rick Reamisch Affirmed the CCE's decision.

23.) On May 31, 2007, I sent Lt. Trinrud a letter regarding the denial of publication form he had issued to me. I asked that he clarify the form and better yet issues me separate forms so that I could have a better understanding of why these books and newspapers were being denied. I asked that he respond to me in writing. **Exhibit AH**

a. Lt. Trinrud never responded to me. It stressed me that these professional people would not respond to my legitimate concerns regarding something so precious to me as my religion.

24.) On June 6, 2007, I sent a letter to Lt. Trinrud regarding a brief conversation we had that morning regarding the reasoning behind the initial confiscation of my books and newspapers. I requested that he respond to me in writing. **Exhibit AI** This response clearly demonstrated that the confiscation of my religious materials and other publications was done out of malice for not finding what it was they were originally searching for, but could not find.

a. Lt. Trinrud responded to this letter on 6-8-2007. His response was, "I had your cell searched for cause on the above date, based on the fact that you were receiving pornographic photos from a falsified Law Firm making it look like legal mail." **Exhibit AJ**

25.) On June 8, 2007 I filed an Inmate Complaint regarding the denial of publications that have already been allowed into the institution, reviewed by the Publication Review Committee, then confiscated and denied. The outcome of this complaint was that it was dismissed. **Exhibit AK**

a. ON June 11, 2007, the ICE acknowledged this complaint with a receipt and assigned it a complaint number. Number **RGCI-2007-17028**
b. ON July 5, 2007, the ICE recommended that this complaint be dismissed. ICE Wess stated that, "All item in Mr. Black's possess, including publications, are subject to inspection at any time while he in incarcerated an any state correctional facility."
c. ON July 5, 2007, The Reviewer, Warden, Jeff Endicott, agreed with this decision and dismissed this complaint as well.
d. ON July 9, 2007, I submitted a "Request for Corrections Complaint Examiner (CCE) Review". In this request I re-asserted my claims and brought into question the policies of the "Sunset Property Clause of Previously Approved Religious Property Items" and the previous treatment of Mr. Lorenzo B. Winford, regarding an issues very similar to my own.
e. ON July 11, 2007, the CCE acknowledged receipt of this complaint.
f. On July 11, 2007, the CCE, Mr. Tom Gorzinski decided that the "institution's complaint examiner's report reasonably and appropriately addressed the issue raised by the inmate." He then recommended dismissal.
g. On July 11, 2007, Deputy Secretary of Corrections, Mr. Rick Raemisch, agreed with the CCE decision, and dismissed this complaint

26.) On June 8, 2007, Upon information and belief, my Mother Ms. Jacqueline Mitchell Received a letter from Security Chief, Mr. Dan Westfield regarding her son, Mr. Nicholas Black and the publications he (Nicholas Black) had, had denied at Redgranite. His letter did not specify to what letter he was responding to that she'd wrote him. In the letter Mr. Westfield very unprofessionally lied, as ALL the publications she had made mention of, specifically the Final Call Newspaper in particular had not been returned to her son (Nicholas Black). **Exhibit AL**

a. Along with this letter He provided her with a copy of the Reviewed Publications and Books list. **Exhibit AM**

27.) On June 10, 2007, I sent a letter to Lt. Trinrud with further inquires into the why he ordered my cell to be searched and the denied book, *Consequences of Oppression, Hell on Earth*. My most important question was, if I was thought to be receiving porno via legal mail, then what did my books and newspapers have to do with anything? I asked that he respond to me in writing. **Exhibit AN**

a. Lt Trinrud never responded to me regarding these issues. It stressed me that these professional people would not respond to my legitimate concerns regarding something so precious to me as my religion.

28.) On June 11, 2007, upon information and belief, my Mother, Ms. Jacqueline Mitchell, sent a letter to Secretary of Corrections, Mr. Matthew J. Frank regarding her son's confiscated and denied books, newspapers, and the banned publications list in use by the department of corrections. **Exhibit AO**

a. He did not respond to this letter. It stressed me that these professional people would not respond to my legitimate concerns regarding something so precious to me as my religion.

29.) On July 1, 2007, I sent a letter to Warden, Eckstein regarding the religious and racial discrimination I was experiencing and the worsening conditions I was experiencing here at Redgranite. I asked that he respond to me in writing. **Exhibit AP**

a. On July 9, 2007, the warden responded to this letter. The only thing of relevance he said was that my publications "are currently under review by DAI Security Chief, Mr. Dan Westfield. **Exhibit AQ**

30.) On July 1, 2007, I sent a letter to Lt. Trinrud regarding and explanation as to why my books and Final Calls were denied on 5-31-07 and requested again, a response to my "unanswered questions" regarding the confiscation of my books. I asked that he respond to me in writing. **Exhibit AR**

a. Lt Trinrud Never responded to this letter. It stressed me that these professional people would not respond to my legitimate concerns regarding something so precious to me as my religion.

31.) On July 2, 2007, I sent a letter to Secretary of Corrections, Mr. Matthew J. Frank, informing him of my issues with the Department regarding the long list of racially motivated actions being committed by the staff here are Redgranite Correctional Institution. I asked that he respond to me in writing. **Exhibit AS**

a. He never responded to me. It stressed me that these professional people would not respond to my legitimate concerns regarding something so precious to me as my religion.

32.) On July 10, 2007, I met with Crisis Intervention worker "Jean" regarding the stress I am experiencing as a result of having my religious materials taken and the constant harassment and discrimination I am experiencing on account of my religious beliefs and race. **Exhibit AT**

a. Her advice to me was to give up the fight in order to restore peace to my soul.

33.) On July 13, 2007, I submitted a request from to the Health Services Unit here at Redgranite. I requested a refill on my headache medication. **Exhibit AU**

a. I received the medication the next evening.

34.) On July 15, 2007, I sent a letter to Lt. Trinrud regarding the Final Call Newspaper. I had received a new edition of the Final Call, (July 17, 2007 Issue 41) On Friday July 13, 2007, and was concerned that I may be in possession of contraband. **Exhibit AV**

   a. Lt. Trinrud never responded to me regarding this matter. It stressed me that these professional people would not respond to my legitimate concerns regarding something so precious to me as my religion.

35.) On July 15, 2007, I sent a letter to Security Director, Eckstein (ALSO) regarding the Final Call Newspaper. I had received a new edition of the Final Call (July 17, 2007 Issue #41) on Friday July 13, 2007, and was concerned that I may be in possession of contraband. **Exhibit AW**

   a. Security Director Eckstein, did not respond in writing, however he did return to me my letter along with a message that said, "you can keep the issue that you have of the Final Call, however every future edition will be reviewed by security fist." **Exhibit AX**

36.) On or around July 15, 2007, I also sent a letter to Mr. Dion Lacy, and inmate at Waupun Correctional Institution. I wrote Mr. Lacy because upon regarding this issue of the Final Call (July 17, 2007 Issue #41)**Exhibit AY**, I noticed that he had therein, a published editorial-from prison. I knew Mr. Lacy in 2005, when he was incarcerated here with me in Redgranite. I asked Mr. Lacy whether he's been experiencing trouble with his newspaper subscription, and explained what I'd been dealing with here at Redgranite.

   **a.** On July 27, 2007, Mr Lacy Responded to my letter. My Lacy informed me that he had not experienced any disruption in his paper service. **Exhibit AZ**

37.) On July 20, 2007, I sent a letter to Security Director, Eckstein regarding my recent receipt of the Final Call Newspaper and requesting something in writing certifying my authorized receipt of the paper. **Exhibit BA**

   a. He never responded to my letter. It stressed me that these professional people would not respond to my legitimate concerns regarding something so precious to me as my religion.

38.) On July 30, 2007, I had notarized, signed myself, and deposited inside of the U.S. Postal box inside of RGCI, a notice of injury and Claim, Pursuant to Section 893.82, Wisconsin Statutes Annotated. **Exhibit BB**

   a. On August 8, 2007, The Office of the Attorney General Acknowledged receipt of this Notice

39.) On August 1, 2007, I received a letter Dr. Criag Blumer, Psychologist Supervisor at RGCI. **Exhibit BC**

   a. On August 3, 2007, I responded to Dr. Blumer's letter. **Exhibit BD**

40.) On Monday August 6, 2007, I met with Dr. Blumer to discuss my nightmares. **Exhibit R-1**

41.) On August 20, 2007, Mr. Lorenzo Winford, signed and submitted to me a DECLARATION concerning his experience with Lt. Trinrud re-reviewing religious books that he arrived at Redgranite with, and denying them. **Exhibit BE**

a. My Winford also submits a copy of the CCE's response in his complaint that "books that have been previously approved do not require further review." **Exhibit BF**

42.) On August 20, 2007, Mr. Kwesi Amanoo, signed and submitted to me a DECLARATION concerning his experience with Lt. Trinrud confiscating and denying his (Nation of Islam) religious texts. Mr. Amonoo's statement also declared that in the RGCI chapel, there are a number of different Christian newspapers available to inmates. **Exhibit BG**

43.) On August 23, 2007, I submitted for myself, a declaration concerning my visits to the Institutions psychologist (for the one occasion that apparently was not documented and the other when I was just unable to obtain the copy at the date of my file review), copies of the prescription the Dr. prescribed for me, a listing of the publications I observed free to inmates in the chapel and a copy of page 39, from the Final Call Newspaper. **Exhibit R**

a. On July 12, 2004, I acknowledged to the Department of Corrections that my religious preference was Islam on their DOC-1090 form. There is a place for other, but knowing that professing my Nation of Islam belief would only make me a target for harassment and discrimination, the umbrella of Islam served just fine. **Exhibit BH**

b. On October 24, 2007, Redgranite Correctional Institution wrote a check, Check No. 26845 to the Final Call Newspaper for $12.00, for a Final Call Newspaper subscription renewal. At this time I was able to freely subscribe and receive the Final Call Newspaper. **Exhibit BI**

c. A copy of page 39, from the Final Call. This is what was considered to be "Black Separatism." **Exhibit BJ**

Simply put, The denial of my religious newspapers was wrong, and in-effect denied me Freedom of my religion. The confiscation of my books and newspapers from my cell was wrong, and done without regard for the significance of the books that were confiscated. The two aforementioned actions in particular caused me great torment, mental anguish, anxiety, and to be singled out for special treatment. The issuing to me MAIL NON-DELIVERY forms instead of contraband conduct reports was wrong, and negated the significance that the materials that they confiscated had already been reviewed before they got to me.

Due to these (Defendant's) employees of the Department of Corrections' deliberately indifferent attitudes toward my constitutional rights, they have caused me great torment, mental anguish, anxiety, and to be singled out for special treatment.

B. State briefly your legal theory or cite appropriate authority.

**PART B**

1. **The Department of Corrections violated my 1st U.S. Constitutional Amendment right. This right was violated when the DOC denied me access to my religious Newspaper the Final Call. The denial and withholding of these publications prevented me from expressing my religious beliefs and communing with my religious community. The Department of Corrections acted in a deliberately indifferent manner to my rights and these actions caused me great torment, mental anguish, anxiety, and to be singled out for special treatment.**

The Defendant's (All of them) violated my 1st amendment rights when they confiscated and denied my religious newspapers. The Defendants violated my 1st amendment rights when they denied my religious newspapers through the mail. The Defendant's violated my first amendment rights when they in effect enacted a blanket ban on my religious newspapers.

It is well established that prisoners retain constitutional rights within prison walls. **Bell v. Wolfish, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).**

Also, an inmate retains the right to exercise his religious beliefs in prison. **Tarpley v. Allen County, 312 F.3d 895, 898 (7th Cir.2002).**

Prisoners are afforded protections under the free speech and free exercise provisions of the First Amendment, **O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citing Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)),** and the due process provision of the Fourteenth Amendment. **Owen v. Wille, 117 F.3d 1235, 1237 (11th Cir.1997).**

It is known and acknowledged by the WI DOC that religion is good for inmate adjustment to life in prison as well as good for inmate reintegration in to society. **WSA DOC 309.61(1)(a)**

The Final Call Newspaper is a "Religious Text/Newspaper" for members of the Nation of Islam. **Sutton v. Rasheed, 323 F.3d 236, 248 (3d Cir.2003)**

The reading of religious literature is a protected and acknowledged form of religious expression, pursuant to **Rowe V. Davis (N.D. IND 2005), 373 F. Supp 2d 825.** The denial of this paper was a substantial burden on my religious expression.

This denial was classified as to, "Teach or advocate behavior that violates the law of the state or the United States or the rules of the department." Specifically, ICE stated that: "*the publication in question contains a reoccurring article (Pg. 39) that is inappropriate. This article is printed in each issue and as long as these continue to appear, the publication will continue to be denied. In accordance with DOC 309.05(2)(b), this publication is considered injurious... and poses a thread to the security and orderly operation, discipline or safety of the institution. The above mentioned articles are interpreted to teach or advocate behavior that violates the rules of the Department. This publication has been denied throughout the DOC, as noted on the DOC publication List, for the reasons explained above and as such, will be denied at RGCI...*" **Exhibit(s): H, P, S, AE, and AC**

The denial of these papers were enacted in violation of **WAS DOC 309.05** (the established Department of Corrections publication review policy), and the Supreme Court's established standards of review for questionable publications set forward in **Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)** and **Thornburgh v. Abbott, 490 U.S. 401, 109 S.Ct. 1874.** In the end, confiscation of these newspapers was not the least restrictive means necessary of furthering a compelling governmental interest. **Reimann v. Murphy, 897 F.Supp 398 (E.D. WI (1995)**)

One notable failure to these standards was that the, "Black Separatism", that was used to support the denial of the Final Call Newspaper was knowingly allowed- given/returned to me in inside of the publication, *Message to the Blackman in America* on 5-12-07 **(See Exhibit AA**), however Final Call Newspapers were again denied on 5/31/07 This is a clear "exaggerated responses" of a legitimate prison concern.

V. The court has previously held, in relation to the Final Call Newspaper that, ... prison authorities have no legitimate penological interest in excluding religious books from the prison library merely because they contain racist views. Courts have repeatedly held that prisons may not ban all religious literature that reflects racism. **Aikens v. Jenkins, 534 F.2d 751, 756-57 (7th Cir.1976); Long v. Parker, 390 F.2d 816, 822 (3rd Cir.1968). FROM: 827 F.2d 634, McCabe v. Arave, (C.A.9 (Idaho) 1987)**

And, in **McCabe v. Arave, 827 F.2d 634, 638 (9th Cir.1987),** the Court held that, "literature advocating racial purity, but not advocating violence or illegal activity as a means of achieving this goal, and not so racially inflammatory as to be reasonably likely to cause violence at the prison, cannot be constitutionally banned as rationally related to rehabilitation."

Finally, in **411 F.2d 23, Walker v. Blackwell, (C.A.5 (Ga.) 1969),** it was said by the Court concerning the Final Call Newspaper that, ...taken as a whole, the newspapers are filled with news and editorial comment, a substantial portion of which generally encourages the Black Muslim to improve his material and spiritual condition of life by labor and study. Nowhere, including the supposedly inflammatory portions described by the court below, does there appear any direct incitement to the Black Muslims to engage in any physical violence.

These defendants should not be entitled to the luxury of "Qualified Immunity" on this clam as "taken in the light most favorable to the party asserting the injury" these facts show that these defendants violated the plaintiff's, Mr. Nicholas Black's, well established constitutional rights. **Saucier v. Karz, 533 U.S. 194, 201 (2001)**

In conclusion, the defendant's actions became glaringly blatant, arbitrary, and capricious when they allowed me to have the information that they expressly denied in the Final Call Newspaper, while contained in another publication, "Message to the Blackman In America", and continued to deny the Final Call Newspaper. The actions of these defendants have left me without any alternative means of expressing my religious beliefs and practices. In this instance, the Department of Corrections acted in a deliberately indifferent manner to my rights and these actions caused me great torment, mental anguish, anxiety, and to be singled out for special treatment.

2. **The Department of Corrections violated my 5th U.S. Constitutional Amendment right. This right was violated when the DOC denied me access to my religious Newspaper the Final Call, but allowed, and even aided and assisted other faith-based groups to receive their newspapers and pamphlets. My rights were violated when the Department of Corrections asserted to me that these papers were denied "Statewide." The Department of Corrections acted in a deliberately indifferent manner to my rights and these actions caused me great torment, mental anguish, anxiety, and to be singled out for special treatment.**

The Defendant's (All of them) violated my 5th Amendment rights when they denied my access to my religious newspapers while providing other inmates, even one of my religions, access to their (his) religious newspapers.

Pursuant to the 5th Amendment of the United States of America Constitution, I am entitled to equal treatment in and of the law. **U.S.C.A. Const. Amend. XIV** The Supreme Court has concluded that a prisoner must be given "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts". **Cruz v. Beto, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972).**

In the Department of Corrections' denial of the Final Call, it was said that these papers have "*... been denied throughout the DOC, as noted on the DOC publication List, for the reasons explained above and as such, will be denied at RGCI...*" **Exhibit(s): H, P, S, AE,**

Upon information and belief, Mr. Dion Lacy, an inmate in the Wisconsin State Prison system, who is currently being housed in Waupun Correctional Institution. Mr. Lacy, wrote me a letter as response to one that I wrote to him, after seeing his editorial published in then current edition of the Final Call Newspaper. **Exhibit AY** Mr. Lacy stated in his letter that he's been receiving his Final Call Newspapers subscription since

February, during the time I was being told that the Final Call was denied "statewide". **See Exhibit AZ**

This right was further violated by the Department of Corrections provision of other faiths their religious newspapers. Located and freely distributed in the institution's chapel, available are several religious newspapers. **See Exhibit R and Exhibit BG**

These defendants should not be entitled to the luxury of "Qualified Immunity" on this clam as "taken in the light most favorable to the party asserting the injury" these facts show that these defendants violated the plaintiff's, Mr. Nicholas Black's, well established constitutional rights. **Saucier v. Karz, 533 U.S. 194, 201 (2001)**

In Conclusion, by the Department denying me the opportunity to receive the Final Call Newspapers and allowing other faith based groups to still receive their religious newspapers and pamphlets was a clear violation of my equal protection rights. The denial of my papers by the defendants, left without any alternative means of expressing my religious beliefs and practices. By Lying to me, telling me that these papers are denied statewide, was a violation of something, I just don't know what right. By not treating me as one would a "similarly situated" man, my rights to equal protection were again violated. Taken all of this into account, the Department of Corrections acted I a deliberately indifferent way towards me and caused my harm.

3. **The Department of Corrections violated my 14th U.S. Constitutional Amendment right. This right was violated when the DOC denied me proper due process when denying my religious Newspapers. The Department of Corrections acted in a deliberately indifferent manner to my rights and these actions caused me great torment, mental anguish, anxiety, and to be singled out for special treatment.**

Defendant Endicott, Eckstein and Trinrud, consistently violated my rights to due process when the issued me NON DELIVERY OF MAIL/PUBLICATION forms instead of contraband conduct reports for the materials they were confiscating and denying.

The purpose for these actions was to negate the significance of the fact that I had the publications that they were denying from me.

Upon information and belief, submitted to me in a declaration by Mr. Lorenzo Winford, Mr. Winford states that, "books that have been previously approved do not require further review." **See Exhibit BF** Mr. Winford submits this information from a complaint he filed regarding a similar situation. This response is from the Corrections Complaint Examiner in Madison.

These actions appear to be seemingly procedural as they have effected all almost all of the materials I have had confiscated and denied to me. **See Exhibit(s): H, P, S, AE, and AC**

In conclusion, if this significant fact would have not been negated, it would have been seen that it was wrong for the officials to confiscate, and re-review publications that have already been allowed into the institution and deny them.

4. **The Department of Corrections violated my 14th U.S. Constitutional Amendment right. This right was violated when the DOC unjustly confiscated and held my religious text, Message to the Blackman in America, written by the Honorable Elijah Muhammad for an extended period of review, after it had already been reviewed and approved. The Department of Corrections acted in a deliberately indifferent manner to my rights and these actions caused me great torment, mental anguish, anxiety, and to be singled out for special treatment.**

The Defendant's (All of them) violated my 14th amendment right to due process when they confiscated and re-reviewed my religious text. The Defendant's violated established policies of the Department of Corrections when they acted this way.

The book, Message to the Blackman in America is a religious text, pursuant to and as defined in, **Sutton v. Rasheed, 323 F.3d 236 (C.A.3 (P.A.)(2003)**.

A previously approved religious text should not be confiscated and re-reviewed.

Upon information and belief, submitted to me in a declaration by Mr. Lorenzo Winford, Mr. Winford states that, "books that have been previously approved do not require further review." **See Exhibit BF** Mr. Winford submits this information from a complaint he filed regarding a similar situation. This response is from the Corrections Complaint Examiner in Madison.

Also, this book should never have been confiscated on 2/2/07, when it was, not according to **DOC Internal Management Policy (IMP) 6A, the Sunset Clause of Previously Approved Religious Property Items. This policy states,** Inmates shall be allowed to possess previously approved religious property items as verified by the DOC 237-Property Receipt/Disposition form until one of the following occurs: Mandatory Release, Discharge, Parole or disposal of worn or damages items, but no later than June 1, 2007.

The deprivation of this book in-effect caused me to be without a central religious text, which prevented me from practicing my religion generally. **Sutton v. Rasheed, 323 F.3d 236 (C.A.3 (P.A.)(2003).** Furthermore, the deprivation of this book and my religion were done knowing and intentionally, despite the Department of Corrections' acknowledgement that "… religious beliefs can provide support to inmates which may aid in their adjustment to institutional life and can lead to development of community ties which may aid in the inmates success reintegration into the community upon release. WAC 309.61
In Conclusion, the confiscation of the religions text, "Message to the Blackman in America" though only for 108 days caused me great torment, mental anguish, anxiety, and to be singled out for special treatment. This Book should have never been confiscated

in the first place. 108 days of review is outrageous as well." [redacted]

These defendants should not be entitled to the luxury of "Qualified Immunity" on this clam as "taken in the light most favorable to the party asserting the injury" these facts show that these defendants violated the plaintiff's, Mr. Nicholas Black's, well established constitutional rights. **Saucier v. Karz, 533 U.S. 194, 201 (2001)**

In conclusion, The Defendants violated my rights when they left me no alternative means of expressing my religious beliefs for 108 days. The 108 days of review of this 334 page book was outrageous. I feel that if one would have confiscated a bible for 108 days for review, they'd be wrong for doing so. Thus I feel that these defendant's are wrong for doing the equivalent to me The confiscation of the religions text, "Message to the Blackman in America" though only for 108 days caused me great torment, mental anguish, anxiety, and to be singled out for special treatment.

5. **The Department of Corrections violated my rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C.A. 2000cc-1. These rights were violated when they denied me access to my religious Newspapers (the Final Call Newspaper). The denial and withholding of these publications prevented me from expressing my religious beliefs and communing with my religious community. The Department of Corrections acted in a deliberately indifferent manner to my rights and these actions caused me great torment, mental anguish, anxiety, and to be singled out for special treatment.**

The Defendant's (All of them) violated my rights under RLUIPA when they substantially burdened my religious expressions by denying me access to my religious newspapers.

The Religious Land Use and Institutionalized Persons Act (RULIPA), was established in 2000. RLUIPA guaranteed a greater religious freedom, for prisoners (institutionalized persons) **Charles Verhagen, 220 F. Supp 2d 937(W.D. Wis. 2002).** Because the Department of Corrections receives and uses federal grant monies, they are subject to the rules and regulations of RLUIPA. **42 USCA 2000cc-1, Lindel v. McCallum 325 F.3d 1107 (7th Circ. 2003)**

To show a violation under RLUIPA, one must show that their beliefs were sincerely held, **Cutter v. Wilkinson, 544 U.S. 709, 125 S.Ct. 2113 (2005)**. One must also show that the defendant's actions created a "substantial burden" on the exercise of religious belies. **Cutter v. Wilkinson, and Herenandez, 109 S.Ct. 2136**

[redacted] → To address this criteria, I submit a Declaration of my own stating that my religious beliefs are sincerely held. **See Exhibit R** Also, I submit a copy of the Religious Preference form (DOC-1090), I signed on July 12, 2004, long before this violation of my rights began. **See Exhibit BH**
My religious beliefs were "substantially burdened" as defined **Civil Liberties for Urban Believers v. City of Chicago, 342, F.2d 471, 474** (one that necessarily bears a direct

primary, and fundamental responsibility for rendering religious exercise… effectively impracticable.)
Furthermore, in **Rowe V. Davis (N.D. IND 2005), 373 F. Supp 2d 825,** the court held that "reading religious materials is an exercise protected under the free exercise clause." Also, these were not just random religious pamphlets that were confiscated and denied, there were religious texts as defined in **Sutton v. Rasheed, 323 F.3d 236 (C.A.3 (P.A.)(2003)**.

These papers were denied because they were said to, "Teach or advocate behavior that violates the law of the state or the United States or the rules of the department." Specifically, ICE stated that the Final Call, "*... contains a reoccurring article (Pg. 39) that is inappropriate. This article is printed in each issue and as long as these continue to appear, the publication will continue to be denied. In accordance with DOC 309.05(2)(b), this publication is considered injurious... and poses a thread to the security and orderly operation, discipline or safety of the institution. The above mentioned articles are interpreted to teach or advocate behavior that violates the rules of the Department. This publication has been denied throughout the DOC, as noted on the DOC publication List, for the reasons explained above and as such, will be denied at RGCI...*"

This denial was enacted in violation of **WAC DOC 309.05** and well established Supreme Court standards for review of questionable publications set forward in **Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)** and **Thornburgh v. Abbott, 490 U.S. 401, 109 S.Ct. 1874, (U.S.Dist.Col. 1989).** In the end, confiscation of these newspapers was not the least restrictive means necessary of furthering a compelling governmental interest. **Reimann v. Murphy, 897 F.Supp 398 (E.D. WI (1995))**

A few notable failures to these standards was that the, "Black Separatism", that was used to support the denial of the Final Call Newspaper was knowingly allowed- given/returned to me in inside of the publication, *Message to the Blackman in America* on 5-**11**-07 **(See Exhibit AA)**, however Final Call Newspapers were again denied on 5/31/07. This is a clear "exaggerated responses" of a legitimate prison concern. Furthermore, the denial of Black Separatism would be a violation of my **14th** amendment rights to be treated fairly, as White Supremacy is allowed in Adolph Hitler's *Mein Kompf.* Also, it should be noted that the I was allowed to order the Final Call Newspaper from RGCI, in October 2006. See ExB. BI
Since that time, no policies had changed within the DOC's publication review procedures. The only change was the opinion of one of LT. Trinrud.

VI. The court has previously held, in relation to the Final Call Newspaper that, … prison authorities have no legitimate penological interest in excluding religious books from the prison library merely because they contain racist views. Courts have repeatedly held that prisons may not ban all religious literature that reflects racism. **Aikens v. Jenkins, 534 F.2d 751, 756-57 (7th Cir.1976); Long v. Parker, 390 F.2d 816, 822 (3rd Cir.1968). FROM: 827 F.2d 634, McCabe v. Arave, (C.A.9 (Idaho) 1987)**

And, in **McCabe v. Arave, 827 F.2d 634, 638 (9th Cir.1987),** the Court held that, "literature advocating racial purity, but not advocating violence or illegal activity as a means of achieving this goal, and not so racially inflammatory as to be reasonably likely to cause violence at the prison, cannot be constitutionally banned as rationally related to rehabilitation."

Finally, in **411 F.2d 23, Walker v. Blackwell, (C.A.5 (Ga.) 1969),** it was said by the Court concerning the Final Call Newspaper that, …taken as a whole, the newspapers are filled with news and editorial comment, a substantial portion of which generally encourages the Black Muslim to improve his material and spiritual condition of life by labor and study. Nowhere, including the supposedly inflammatory portions described by the court below, does there appear any direct incitement to the Black Muslims to engage in any physical violence.

These defendants should not be entitled to the luxury of "Qualified Immunity" on this clam as "taken in the light most favorable to the party asserting the injury" these facts show that these defendants violated the plaintiff's, Mr. Nicholas Black's, well established constitutional rights. **Saucier v. Karz, 533 U.S. 194, 201 (2001)**

In Conclusion, the Department of Corrections violated my right to Freedom of Expression under, **42 USCA 2000cc-1** when they denied me access to me religious newspaper, The Final Call. The actions of these defendants left me no alternative means of expressing my religion. No reasonable official would have even made this denial with the Wisconsin Administrative Code written the way that it is. The Muslim program and position, the re-occurring article that caused this denial was clearly an "expression" of religious beliefs and political ideology. This statement was not violent or threatening to the security of this institution. This denial was enforced, in light of the Wisconsin Administrative Code's own acknowledgement (See **309.61 (1)(a)** General Provision) that religion therapeutic for men who are incarcerated. These deliberately indifferent actions of the Department of Corrections caused me great torment, mental anguish, anxiety, and to be singled out for special treatment.

6. **The Department of Corrections violated my 1st and 5th amendment right to freedom of expression and my rights to be treated equally with similarly situated prisoners. These rights were violated when the Department of Corrections confiscated and denied two publications from me. The books that were denied were titled, "*From Niggas to Gods*, Volumes 1 and 2." These books should never have been confiscated or denied.**

Defendants Endicott, Eckstein, Trinrud, and Wess, violated my 1st amendment rights when they confiscated books from my cell and denied them due to content. The Defendants violated my 1st amendment right by keeping and using a list of denied publications and not reviewing all publications individually. The Defendants violated my 5th amendment right when they confiscated from me books that were previously approved, reviewed and denied them.

**1st Amendment violations**

As a prisoner in the Wisconsin State Prison System, I am allowed to order and receive reading materials. **Wisconsin Administrative Code 309.05 (1)** states: The department shall facilitate inmate reading of publications, including books, magazines, newspapers, and pamphlets.

These books were denied by the Publication review committee for3 abstract reasons. These reasons were:

1. Item concerns an activity, which if completed would violate the laws of Wisconsin, The United States or the Administrative Rules of the Department of Corrections.
2. Item poses a threat to the security, orderly operation, discipline or safety of the institution.
3. Item teaches or advocates illegal activity, disruption, or behavior consistent with a gang or violent ritualistic group.

These findings were not supported by any submission of page numbers from the Publication Review Committee. **Thornburgh v. Abbott, 490 U.S. 401, 109 S.Ct. 1874, 1878 (U.S.Dist.Col. 1989)**(The notice must refer to "the specific article(s) or material(s) considered objectionable") **See Exhibit AE**

ICE, Wess, on the other hand did submit page numbers to support her denial of this book stating that,
"These books exhibit a belief that race accounts for differences in human character or ability and that a particular race is superior to others. Specifically, that the White Race continues to enslave the Black race."
From the book, *Volume 1*, it was cited by ICE, Wess:

- "The whiteman controls us through psychological warfare, by using our emotions to make us self destructive! This way he can get rid of us poor, silly dumb niggas, with out getting his hands bloody anymore." P.121
- "The whiteman is constantly trying to hold the Blackman back because he is totally afraid of competing with the Blackman fairly and squarely." P. 127
- "North AmeriKKKa." P. 243

ICE went on to note that "these publications are denied on the DAI Reviewed Publications List. This type of material teaches or advocated violence or hatred, thus presents a danger to Institutional security and order." **See Exhibit AG**

What makes these decisions arbitrary is that even though these citations were cited out of context, nothing cited by ICE Wess was hateful or violent. Furthermore, it is a terrible argument for ICE to make a denial on, citing that these books, "exhibit a belief that race accounts for differences in human character or ability and that a particular race is superior to others. Specifically, that the White Race continues to enslave the Black race." When, According to DAI's reviewed list of publications, Adolph Hitler's *Mein Kampf* is allowed. **See Exhibit AM** Let it be known that in Mr. Hitler's work, he discusses creating

a Master Race, a "Superman". Mr. Hitler discusses accomplishing these goals through the "Cleansing of Blood".

These denials were enacted in violation of **WAC DOC 309.05** and well established Supreme Court standards for review of questionable publications set forward in **Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)** and **Thornburgh v. Abbott, 490 U.S. 401, 109 S.Ct. 1874, (U.S.Dist.Col. 1989).** Clearly, this was not the case concerning the book *Mein Kampf.*

My 1st Amendment right was violated as only *Volume 1*of these two book was reviewed, *Volume 2* was denied because it too was already on the Reviewed Publications listing. **See Exhibit AM** It is a violation of my 1st Amendment rights for the DOC to keep a list of denied publications and not review each publication individually. **Thornburgh v. Abbott, 490 U.S. 401, 109 S.Ct. 1874, 1877 (U.S.Dist.Col. 1989)** and **Williams v. Brimer 116 F.3d 351 (C.A. 8(Iowa)(1997)**

My 1st amendment was also violated when I was not given any type of meaningful statement for denial in regards to Volume 2 of these two books, pursuant to **Thornburgh v. Abbott, 490 U.S. 401, 109 S.Ct. 1874, 1878 (U.S.Dist.Col. 1989)**(The notice must refer to "the specific article(s) or material(s) considered objectionable"). What's more is that I asked Lt. Trinrud to clarify his denial of these books, and he did not respond. **See Exhibit AH**

**5th Amendment Violations**

Even in a prison setting I am supposed to be, "Entitled to be free from arbitrary actions of officials that affect the constitutional protected interests." **Harahan v. Lane, 747 F.2d 1137 (7th Circ. 1984) Wolff, 418 US 588, 94 S.Ct. at 1874**

It is not normal and general policy for officials to confiscate books that have already been approved into the institution.

Upon information and belief, submitted to me in a declaration by Mr. Lorenzo Winford, Mr. Winford states that, "books that have been previously approved do not require further review." **See Exhibit BF** Mr. Winford submits this information from a complaint he filed regarding a similar situation. This response is from the Corrections Complaint Examiner in Madison.

These actions by these defendant's violated my 5th amendment right because I was not afforded the same treatment as a similarly situated individual.

These defendants should not be entitled to the luxury of "Qualified Immunity" on this clam as "taken in the light most favorable to the party asserting the injury" these facts show that these defendants violated the plaintiff's, Mr. Nicholas Black's, well established constitutional rights. **Saucier v. Karz, 533 U.S. 194, 201 (2001)**

In conclusion, the confiscation, re-review, and denial of these two books was wrong. This denial was done intentional to hurt me, and any other many who I may have shared these books with who make have been touched by something therein and grew a little.

7. **The Department of Corrections violated my 1st amendment right to freedom of expression. This rights were violated when the Department of Corrections denied the publications titled, "*Consequences of Oppression: Hell on Earth.*" This book should never have been denied.**

Defendants Endicott, , Eckstein, Trinrud, and Wess, violated my 1st amendment rights when they denied me books through the mail.

An a prisoner in the Wisconsin State Prison System, I am allowed to order and receive reading materials. **Wisconsin Administrative Code 309.05 (1)** states: The department shall facilitate inmate reading of publications, including books, magazines, newspapers, and pamphlets.

This book was denied to me through the mail. My 1st amendment rights were violated by the Publication review committee, as their reason for denial was that this book contained "Black Separatism" and "5% ers". My 1st amendment rights were again violated by the ICE as she denied for the aforementioned reasons as well as for this book, "containing a reference to bestiality". All of these findings may not have been baseless, but none-the-less, all combined were insufficient to support such a denial.

The Publication Review Committee's reason for denying this book because it contained Black Separatism is flawed because in this country citizens are free to separate from whomever they please **(Freedom of Association)**. The Publication Review Committee's reason for denying this book because it supports the 5%ers, and Security Threat Group (STG) was also flawed, as the support or presence of support, of an STG does not necessarily make a book a threat to the prison. **Shaheed-Muhammad V. Dipaolo, 393 F. Supp 2d 80 (D. Mass. 2005)** ICE's reason for denying this book to me in agreement with the publication review committee's findings and added that, this book also contains a "reference to bestiality", is flawed because a reference is not the counseling of an act, or there encouragement to engage in the act.

Most importantly, no page numbers to support these denials were ever given by the Publication Review Committee or ICE, Wess. This failure was a denial of a meaningful statement of denial. **Thornburgh v. Abbott, 490 U.S. 401, 109 S.Ct. 1874, 1878 (U.S.Dist.Col. 1989)**(The notice must refer to "the specific article(s) or material(s) considered objectionable") **See Exhibit J** What's more is that I asked Lt. Trinrud to clarify his denial of these books, and he did not respond. **See Exhibit AN**

Though I have never been able to review this publication myself, I feel that these denials are violating **WAS 309.05** and well established Supreme Court standards for review of questionable publications set forward in **Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)** and **Thornburgh v. Abbott, 490 U.S. 401, 109 S.Ct. 1874, (U.S.Dist.Col. 1989).**

My 1st amendment rights were violated, as I have been making all of my own appeals and the sender of this book, the book store was never contacted about this denial pursuant to, **Thornburgh v. Abbott, 490 U.S. 401, 109 S.Ct. 1874, 1878 (U.S.Dist.Col. 1989).** (The sender of a publication that is denied by the institution should be notified and allowed the chance to appeal that decision, as the inmate does not know what the publication contains as he has not been allowed to see it.)

If the sender of this publication would have been allowed to challenged this denial, as required by **Thornburgh v. Abbott, 490 U.S. 401, 109 S.Ct. 1874, 1878 (U.S.Dist.Col. 1989),** I feel very strongly that this book would have been allowed to me. However, I was unaware of this right of mine at the time, still I feel that I filed a very comprehensive and pointed appeal.

These defendants should not be entitled to the luxury of "Qualified Immunity" on this clam as "taken in the light most favorable to the party asserting the injury" these facts show that these defendants violated the plaintiff's, Mr. Nicholas Black's, well established constitutional rights. **Saucier v. Karz, 533 U.S. 194, 201 (2001)**

In conclusion, the denial of this book was just one link-in the chain of arbitrary decisions that were made by the staff and administration here at Redgranite regarding my reading material. I strongly feel that this denial was an unjustifiably exaggerated response to a legitimate prison concern. This denial was reasoned any way that it could be to deny me this publication.

## VII. RELIEF REQUESTED

WHEREFORE, Plaintiff, Mr. Nicholas Black respectfully prays that this court enters a judgment granting the plaintiff:

A declaration that the acts and omissions described herein violated Plaintiff's rights under the Constitutional and laws of the United States.
Nominal damages in the amount of $100.00.
Compensatory damages in the amount of, $20,000 against each defendant, jointly and severally, totaling $140, 000, jointly and severally.

Punitive damages in the amount of $100,000 against each defendant, jointly and severally.

A jury trial on all issues that could be trialed, to be done so by jury

All of the Plaintiff's incurred costs in this suit.

Any additional relief this court deems just, proper and equitable.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated, This month of October, day of 19, year of 2007.

Respectfully submitted,

[signature]
Nicholas Black
Redgranite Correctional Institution
P.O. Box 925
Redgranite, Wl 54970